[Civ. No. 64737. Second Dist., Div. Two. Sept. 22, 1982.]

STEPHEN C. FORDE, Plaintiff and Appellant, v.
BANK OF FINANCE, Defendant and Respondent.

COUNSEL

Rosenblum, Rabkin, Parish, Bachli & Bacigalupi, Jeffrey J. Parish, Kenneth G. Hausman and Robert L. Gorman for Plaintiff and Appellant.

Barash & Hill, Jerry M. Hill, Gary L. Bostwick and Brian James Bird for Defendant and Respondent.

George Deukmejian, Attorney General, Edmond B. Mamer and Raymond B. Jue, Deputy Attorneys General, as Amici Curiae on behalf of Defendant and Respondent.

OPINION

**COMPTON, Acting P. J.**—Plaintiff Stephen C. Forde instituted an action against the Bank of Finance (Bank) for specific performance of a contract to purchase 500,000 shares of Bank's preferred stock, which purchase would give Forde a controlling interest in Bank.

Plaintiff applied for a preliminary injunction to restrain defendant Bank from selling the stock to other prospective purchasers pending the resolution of the action. Plaintiff now appeals from an order of the trial court denying the application. We reverse.

Because of an impairment of Bank's ability to meet certain capital requirements as specified by the regulations of the California Superintendent of Banks (Superintendent), Bank obtained a permit from the Superintendent to *negotiate* for the sale of the stock which is the subject of this litigation.

This permit did not authorize Bank to effect an actual sale of the stock, since any such sale required an additional authorization or approval by the Superintendent of the buyer and the specific terms of the sale.[1]

Although the actual procedure followed within the office of the Superintendent varies from case to case, the fact remains that the ultimate step in the process is the issuance of a definitive permit to sell after the Superintendent has determined under Financial Code section 693 that the sale is fair and equitable and in the best interests of all parties including the depositors and creditors of the Bank. It is only at that point that any agreement to sell the shares can be fully executed.

Plaintiff and Bank entered into extensive negotiations which involved an offer by the plaintiff and a counteroffer by the Bank. Ultimately a written document was generated containing all of the terms of the agreement and was signed by both parties.[2] That document contained a clause reciting that the agreement was specifically conditioned on the obtaining of the requisite permit and approval by the Superintendent. Plaintiff did not deliver any money to Bank.

Subsequently the Bank repudiated the agreement with plaintiff and entered into a contract with another group of investors. That latter agreement was approved by the Superintendent and we are advised that 400,000 of the 500,000 shares have been sold to those investors.

That sale, however, was made after the commencement and with notice of the pending litigation and plaintiff's claim to the shares. The sale in fact was effected after the denial of the motion for a preliminary injunction and the institution of this appeal. Since it yet may be possible to fashion an equitable decree which would result in specific performance, we do not consider the issue to be moot.

A preliminary injunction to prevent sale of the remaining 100,000 shares would have the effect of ameliorating the difficulty of fashioning such a decree. We thus examine the trial court's order of denial uninfluenced by the fact of the sale which occurred after that order.

---

[1] Financial Code section 691 provides: "No bank organized under the laws of this state shall offer or sell any security issued by it unless the superintendent has issued a permit authorizing such sale."

[2] There is a dispute between the parties as to whether plaintiff's acceptance of the Bank's counteroffer was timely and unconditional but that is a matter which need not concern us here, since there is ample evidence that the contract was agreed to.

It is clear from the record that the trial court's order denying the request for a preliminary injunction was predicated squarely on the grounds that the contract between plaintiff and Bank was illegal and void because it was executed prior to the Bank's obtaining of a permit from the Superintendent to *sell* the shares.

■ The record makes it clear that plaintiff was not in pari delicto with Bank. The mere fact that plaintiff knew that a permit was required and that Bank was obligated to obtain the permit before an actual consummation of the sale could take place was not a sufficient basis to permit the Bank to urge the defense of pari delicto. (See *Western Oil Etc. Co.* v. *Venago* (1933) 218 Cal. 733 [24 P.2d 971, 88 A.L.R. 1271], Marsh & Volk, Practice Under the California Securities Laws, § 14.01.)

■ The granting or denial of a request for a preliminary injunction is addressed to the exercise of sound discretion by the trial court. (*People* v. *Pacific Land Research Co.* (1977) 20 Cal.3d 10 [141 Cal.Rptr. 20, 569 P.2d 125].) The exercise of that discretion is based on considerations of the balancing of the hardship on one or the other of the parties and the likelihood that the moving party will prevail in the trial on the merits.

■ In balancing the hardships it is clear that plaintiff would suffer a greater hardship from the denial of the preliminary injunction than Bank will suffer from the granting thereof. (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512 [67 Cal.Rptr. 761, 439 P.2d 889]; *Addiego* v. *Hill* (1968) 268 Cal.App.2d 280 [73 Cal.Rptr. 901]; *Riviello* v. *Journeymen Barbers etc. Union* (1948) 88 Cal.App.2d 499 [199 P.2d 400].)

Thus we turn to the real issue presented and that is the likelihood of plaintiff prevailing on the merits of his action. That issue in turn rests on the determination of whether the contract plaintiff seeks to specifically enforce was illegal and void or merely voidable on the Superintendent's denial of a permit or, stated another way, whether a contract which is specifically conditioned on the obtaining of a permit can ever be specifically enforced.

As we earlier mentioned, Financial Code section 691 mandates that no bank shall offer or sell any securities issued by it without a permit

from the Superintendent. Financial Code section 690 defines "sale" or "sell" to include "contract of sale."

The ultimate responsibility of the Superintendent in issuing a permit for the sale of securities is to determine whether the sale is fair, just and equitable, after a review of the details of the sale and the party to whom the securities are to be sold.

After consideration of the contentions of both the Bank and the Superintendent we are hardpressed to discern just what it is about the form of the contract in question here which would characterize it as "illegal."

The Superintendent authorized the Bank to "negotiate" for the sale of its shares. In the ordinary sense of the word, "negotiate" means to engage in the process of proposing and counter proposing with a view to reaching mutually acceptable terms of an agreement.[3]

If a bank and a proposed purchaser were not permitted to reach some form of a detailed agreement through their negotiations, there would never be any finite proposal on which the Superintendent could pass judgment.

Further, common sense and good business practice would dictate that the terms of the negotiated agreement be reduced to writing and subscribed by the parties. Any less formality would place the Superintendent in a position of approving a sale, the terms of which might be later subject to dispute between the parties.

Thus we conclude that the fact that the agreement here was in writing and signed by the parties did not violate the terms of the permit to "negotiate" especially since it was specifically recited in the agreement that its execution or consummation was conditioned on approval by the Superintendent.

---

[3]Black's Law Dict. (5th ed. 1979) p. 934, col. 1, defines "negotiate," inter alia: "[T]o bargain with another respecting a purchase and sale; to conduct communications or conferences with a view to reaching a settlement or agreement. It is that which passes between parties or their agents in the course of or incident to the making of a contract and is also conversation in arranging terms of contract. [¶] To communicate or confer with another so as to arrive at the settlement of some matter. To meet with another so as to arrive through discussion at some kind of agreement or compromise about something."

Financial Code section 691 contains no statement that a contract to sell entered into prior to the obtaining of a permit is "void." That statute is designed, inter alia, to protect proposed investors such as plaintiff. It is not, and cannot be, used as a shield behind which the Bank, with impunity, plays one group of investors off against another by using an agreement with one group as leverage for increasing the ante from another.

The record before us discloses that Bank sought out plaintiff as a proposed investor. Thereafter plaintiff engaged in good faith negotiations in reaching an agreement acceptable to both parties—one which both parties apparently believed was fair and equitable—one which both parties believed would survive the Superintendent's scrutiny.

Bank, however, without taking any steps toward seeking the Superintendent's approval, for some reason, transferred its affections to another group of investors thereby denying to plaintiff his reasonable expectations of obtaining a unique asset, to wit, control of Bank. Bank's conduct would not appeal to the conscience of the chancellor.

Prior to 1968[4] former Corporations Code section 26100 et seq. contained strict permit requirements for the sale and issuance of corporate securities. A relevant analysis of that law is contained in 1 Marsh & Volk, *supra*, § 14.01[1][b] as follows:

"Void Securities. The previous California Corporate Securities Law provided in Section 26100 of the Corporations Code that any security 'sold or issued' without a permit (when one was required), or in nonconformity with a permit obtained, was 'void.' This was the only provision in the entire statute having any bearing on civil liability. While there were more appellate decisions rendered in California in civil actions relating to violations of the Blue Sky law than in any other half-dozen states combined, they were all in the final analysis an attempt to illustrate the meaning of this one word—'void.'

"It was early decided by the California courts that in fact the word 'void' did not actually mean void, but only 'voidable.' Any other result, of course, would have permitted a corporation which deliberately violated the Corporate Securities Law, and sold stock to a purchaser without

---

[4]In 1968, the Legislature amended the Corporate Securities Law to grant various exemptions from permit requirements in the negotiating and subscribing of corporate securities.

obtaining a permit, later to deny him the rights of a shareholder on the basis that the stock which it purportedly issued to him was void. Therefore, the California decisions held that in the normal case the person acquiring stock issued in violation of this provision in effect had an election to insist upon the validity of the stock and his rights as a shareholder or to sue to have the stock declared 'void' and obtain the return of the consideration which he paid, plus interest."

Bank here argues that in adopting the 1968 ameliorating amendments to the Corporate Securities Law, the Legislature did not alter the permit requirements applicable to banks. Bank further argues that the Corporate Securities Law is not applicable to banks, for the reason that the nature of the banking business and the concern for the depositing public requires stricter regulation.

We agree, as an abstract proposition, that banks are and should be subject to stricter scrutiny than other corporations. The answer to Bank's argument, however, is that that strict scrutiny and control is not diluted or weakened by our view of the circumstances here. No transfer of the shares can or will take place under the agreement without approval of the Superintendent.

The Superintendent's authority, however, is not absolute or unreviewable. As an administrative agency of the state the Superintendent may not act arbitrarily or capriciously in withholding his permit approval.

This brings us to the critical issue and that is whether the simple fact that performance of the agreement is conditioned upon the approval of the Superintendent, ipso facto places the agreement beyond the reach of an equitable decree of specific enforcement.

It has been held that a contract, performance of which is dependent on the consent of third parties who are not parties to the contract, cannot be specifically enforced. (*Armstrong* v. *Sacramento V. R. Co.* (1921) 52 Cal.App. 110 [198 P. 217].)

"'Where a defendant's performance depends on the consent or approval of one not a party to the contract *who is free* to withhold his consent, specific performance of the contract will not be decreed *where it does not appear that such consent or approval has been or can be obtained*, or where it appears that such consent or approval is withheld or

refused or has become impossible.'" (*Casady* v. *Modern Metal etc. Mfg. Co.* (1961) 188 Cal.App.2d 728, at p. 731 [10 Cal.Rptr. 790], italics added.)

Here it does not appear that the Superintendent's approval would necessarily be withheld or impossible of obtainment and, as we have pointed out, the Superintendent is not *absolutely* free to withhold his approval.

In *Kaneko* v. *Okuda* (1961) 195 Cal.App.2d 217 [15 Cal.Rptr. 792], it was specifically stated at page 232: "'The law appears to be clear that the necessity of securing the approval of a governmental agency to the complete performance of an agreement is no bar to the granting of specific performance thereof.'"

We conclude that the denying of plaintiff's request for a preliminary injunction was an abuse of discretion since it was predicated on an erroneous determination that the contract was void.

The order denying the preliminary injunction is reversed. The matter is remanded to the trial court with directions to reconsider plaintiff's application for a preliminary injunction in accordance with what we have here stated.

Beach, J., and Gates, J., concurred.

On October 19, 1982, the opinion was modified to read as printed above.