[Nos. D049161, D049890. Fourth Dist., Div. One. Feb. 26, 2008.]

REAL ESTATE ANALYTICS, LLC, Plaintiff, Cross-defendant and Appellant, v.
THEODORE TEE VALLAS, Individually and as Trustee, etc., Defendant, Cross-complainant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of Discussion parts I. and III.

464

COUNSEL

Kulik, Gottesman, Mouton & Siegel and Donald S. Gottesman for Plaintiff, Cross-defendant and Appellant.

The Loftin Firm, L. Sue Loftin, Michael D. Stump, Robert Grabo and Avneet Sidhu for Defendant, Cross-complainant and Appellant.

## OPINION

**HALLER, J.**—The court, sitting without a jury, found a property owner breached his contract to sell a large parcel of coastal property to an investment company. The court, however, refused to grant the buyer's request for specific performance based on the court's conclusion that monetary damages were adequate because the buyer's primary motivation was to quickly turn the property for a profit. We hold the court erred in refusing to grant specific performance on this basis. The law generally presumes real property is unique and that the breach of an agreement to transfer property cannot be adequately relieved by pecuniary compensation. The seller here did not overcome this presumption merely because the buyer's purpose in purchasing the property was to earn profits from developing and/or reselling the property.

## INTRODUCTION

Real Estate Analytics, LLC (REA), contracted with Theodore Tee Vallas (Vallas) to purchase 14.13 acres of land in northern San Diego County. After Vallas cancelled the contract, REA brought a breach of contract action seeking specific performance. Vallas cross-complained against REA and two individuals involved in the attempted purchase. After a court trial, the court found Vallas breached the contract, but refused to grant specific performance and instead awarded REA damages of $500,000, reflecting the difference between the contract price and the fair market value at the time of the breach. The court found Vallas did not prove his claims on the cross-complaint. The court awarded REA attorney fees of $272,918.

Each party appeals. In the published portion of the opinion, we hold that the trial court abused its discretion in refusing to award specific performance as a remedy for Vallas's breach of the real estate contract. We thus reverse and remand with directions for the court to grant specific performance.

In the unpublished portion of the opinion, we reject Vallas's challenge to the sufficiency of the evidence supporting the court's finding that Vallas's father acted as Vallas's agent in his dealings with REA principals. We also reject Vallas's arguments in a separate appeal consolidated with this appeal that the court erred in finding REA was the prevailing party for purposes of attorney fees.

## FACTUAL AND PROCEDURAL SUMMARY

In summarizing the factual record, we state the facts in the light most favorable to the court's rulings. (See *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1137–1138 [74 Cal.Rptr.2d 510].)

REA is a limited liability company formed by Troy Shadian. In January 2004, Shadian and his business partner, Roshan Bhakta, became interested in Vallas's 14.13-acre property (the Lanikai Lane property) located in Carlsbad near the Pacific Coast Highway. The property contained a mobilehome park with 147 individual mobilehomes and numerous amenities, including a pool, playground, laundry facilities, and a long winding street. Vallas leased the property to a mobilehome park operator, which managed the park and subleased the spaces to residents who owned their mobilehomes. The lease began in 1951 and terminates in 2013.

Vallas, who was in his mid-40's, owned the Lanikai Lane property, but had never been to the property because he considers the property to be his in name only. He inherited it from his maternal grandparents, and all income from the property is placed in a separate account which he does not use. His father, also named Theodore Vallas (referred to in this opinion as Father), is an experienced businessman who manages all aspects of the Lanikai Lane property on Vallas's behalf. The only authority that Vallas did not delegate to Father was the responsibility for signing legal documents.

Beginning in January 2004, REA principals and Father engaged in negotiations regarding the purchase of Lanikai Lane. Once they reached a deal, in March 2004, REA and Vallas entered into a written purchase and sale agreement. Under the agreement, the sales price was $8.5 million, with REA to pay an immediate $100,000 deposit, and then pay $2.9 million at closing. In return, Vallas agreed to finance the remaining $5.5 million, with the unpaid

balance to be paid over a five-year period, with the balance due on April 1, 2009.

REA's primary goal in purchasing the property was to make a profit for its investors. One proposed business model was to subdivide the property and sell the subdivided lots to the property's mobilehome park residents. Shadian and Bhakta intended to make a substantial monetary profit through this investment.

In late March 2004, the parties opened escrow, and REA placed $100,000 in cash as a deposit. Escrow was scheduled to close on May 10, 2004. However, in a written modification, the parties agreed to extend this date to May 31, 2004.

In mid-May, REA sought a further extension to June 30, 2004, because of various remaining due diligence issues on both sides. On May 13, Father, who had represented Vallas in all previous negotiations, orally agreed to the extension. Father thereafter engaged in conduct consistent with a conclusion that he and Vallas had approved the extension. The parties continued with their due diligence during this period and met several times. However, Father (on Vallas's behalf) also accepted a $13 million backup offer from the mobilehome park residents, who had formed an association for the purpose of purchasing the property.

Two weeks before the escrow was to close, on June 13, Father called REA's real estate agent and escrow agent and told them he was "cancelling the deal." The next day, on June 14, Father sent a fax to Bhakta and Shadian stating that Vallas was cancelling the contract. On that same date, Vallas sent a fax to REA stating he was cancelling the escrow.

The next day, on June 15, REA filed a superior court complaint against Vallas, seeking specific performance of the real estate purchase contract. REA alleged Vallas breached the agreement by anticipatory repudiation when he expressed his unequivocal intention not to sell the property to REA, and by failing to provide required due diligence documents. REA also alleged that Vallas's breach of the agreement could not be adequately relieved by pecuniary compensation and therefore REA had no adequate remedy at law and was entitled to specific performance. REA claimed the sales price constituted adequate consideration and the agreement was just and reasonable in all respects. REA recorded a notice of pendency of action. Vallas did not move to expunge the lis pendens.

Vallas cross-complained against REA, Shadian, and Bhakta, alleging these parties failed to disclose that they had no financial ability to purchase the

property at the agreed price, and breached the agreement by failing to close escrow on time.

At trial, REA's primary legal theory was that Vallas breached the contract by repudiating it on June 14 without providing REA the opportunity to perform its contractual obligations of depositing the $2.9 million into escrow. In defense, Vallas argued that he was entitled to cancel the contract because REA breached the contract first by failing to make the $2.9 million deposit by May 31. Vallas testified that he never agreed to extend the escrow date beyond May 31, and that to the extent that Father gave this extension, Father was not his agent and therefore he was not bound by Father's acts.

In support of its request for specific performance, REA presented evidence of its ability to perform the contract at the time of the breach and at the time of trial. This evidence showed that Shadian and Bhakta were successful and experienced investors and had a large network of financially well-off supporters who were interested in this property and from whom they could immediately raise the additional $2.9 million needed to close the deal. REA also presented evidence that the contractual terms were fair and reasonable, and that the consideration was adequate. In this respect, REA called a real estate appraiser as an expert witness who testified that the fair market value of the property (encumbered by the long-term lease) was $9 million at the time of the contract formation and of the breach.

Vallas countered that even if he breached the agreement, REA was not entitled to specific performance because REA was not ready, willing and able to deposit the $2.9 million into escrow. He also argued that REA's legal remedy was adequate because the subject matter of the transaction was commercial property and the loss of the investment could be adequately offset by a pecuniary award.

At the conclusion of the trial, the court announced its rulings. With respect to the agency issue, the court stated that "substantial and credible evidence" showed Vallas gave Father full authority to act on his behalf "in all matters related to the subject property." The court further found that because Father continued to operate as if the contract was "in full force" after the May 31 closing, Vallas waived his right to assert REA breached the contract by not placing the funds into escrow by that date. The court thus found that Vallas's June 14 cancellation constituted a breach of the agreement.

But the court declined to award specific performance based on its finding that damages would provide REA adequate relief. As detailed in the Discussion below, the court found specific performance was not appropriate because REA purchased the property "solely as a commodity" to earn

"money for their investors," and not because of the "uniqueness" of the property itself. The court awarded REA $500,000, reflecting the difference between the contract price and the value of the property on the date of the breach, plus interest on the $100,000 deposit.

REA then moved to vacate the judgment and for a new judgment on the remedy issue. REA argued that under California law a finding that the plaintiff's sole purpose in purchasing real property was to make money is insufficient to support a finding that damages are an adequate remedy. After lengthy argument, the court denied REA's motion, explaining that the purchase of "this property was nothing more than a vehicle to make money" and therefore monetary damages were adequate to compensate for the breach.

## DISCUSSION

### I. Vallas's Appeal: Challenge to the Court's Actual Agency Findings[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II. REA's Appeal: Specific Performance

REA contends the court erred in refusing to order specific performance of the parties' real estate contract.

#### A. Background Information

In its complaint filed one day after Vallas cancelled the contract, REA requested specific performance because of the inadequacy of the legal remedy. During closing arguments at trial, REA's counsel urged the court to grant this remedy, citing the statutory presumption that a damages remedy is inadequate for a breach of a real property sales contract (Civ. Code, § 3387), and emphasizing the unique coastal location and size of the property.

Vallas's counsel responded that specific performance was not an appropriate remedy because "by the testimony of their [appraisal] expert, there are a number of ocean accessible, visible, mobile home parks that had sold on or around the time of the Lanikai Lane original contract and therefore for purposes of specific performance, damages should be adequate remedy in this case." When the court asked counsel to elaborate on this argument, Vallas's counsel stated that the REA principals "did not meet their burden nor did they really present anything that it was a unique piece of property. . . . Say it is by

[*]See footnote, *ante*, page 463.

the ocean and a mobile home park, that is simply not sufficient. . . . There are similarly situated commercial properties that could at some point or another be purchased or not purchased. . . . I believe that the burden shifted to [REA] once [the] appraiser indicated that there were other properties similarly situated and they did not go further to substantiate that it was a unique piece of property. So I believe that they did not, once the burden shifted, meet their burden to establish the uniqueness."

After considering these arguments, the court ruled it would not grant specific performance because a damages remedy would provide REA adequate relief. The court explained its reasoning as follows: "A remedy at law is adequate for Plaintiff and therefore it would be improper to specifically enforce the subject contract. In quoting *Reese v. Wong* . . . (2001) 93 Cal.App.4th 51 [112 Cal.Rptr.2d 669], 'a presumption of uniqueness is often inappropriate with respect to commercial real estate. The essence of commercial activity is the earning of money. Loss of a commercial investment can normally be offset by a pecuniary award.' [REA], and specifically, Shadian and Bhakta purchased the subject property known as Lanikai Lane solely as a commodity. The evidence is overwhelming that their sole purpose in buying this property was to make money for their investors, as they have done on many, many occasions. The property's uniqueness was not a concern. Their goal was to turn a profit from the property as quickly as possible by potentially buying out the leaseholder or reselling the property to someone else. The long history of dealing with the issue of whether or not the property is unique can be analogized to art. Courts oftentimes . . . specifically enforce the sale of residential and other properties because of the uniqueness of the property itself and the fact that just like art, it cannot be obtained by some other manner. In this particular case, [REA] was not concerned with the property. Bhakta and Shadian were not interested in going into the mobile home business or mobile home rental business. They were not interested in retaining the property for any length of time. They were simply interested, and the entire intent was to earn money for their investors and so therefore, this particular case is consistent with the thinking of *Reese* and as such specific performance under the circumstances of this case would not be appropriate." (Underscoring omitted.)

After the court entered judgment, REA moved for a new judgment on the specific performance issue, asserting that its investment motivation did not, as a matter of law, support the court's legal conclusion that damages were an adequate remedy. REA also argued that the difficulty in estimating lost profits—which REA argued could be as high as $11.3 million based on written projections provided to its investors—established the inadequacy of the damages remedy.

After full briefing and lengthy argument by each counsel, the court denied REA's motion, stating: "I think that . . . Mr. Shadian and Mr. Bhakta and [REA], they viewed Lanikai Lane as a widget . . . that they intended to purchase and I think that the evidence is clear that once they found out about Lanikai Lane from the realtor, their desire was to purchase it very quickly . . . . [T]heir desire was to make as much money as possible from the sale of that property and their investors are expecting for them to make a great deal of profit. In fact, I was struck by how we literally had several investors come in here and tell us that they had made in previous transactions inconceivable amounts of profit. I think the range was something between 20 to 30 percent. [¶] All of those factors in my estimation gave the court the impression that this property was nothing more than a vehicle to make money. . . . And given the circumstances and the evidence that was presented throughout the trial and I also certainly referenced the testimony [of plaintiff's appraisal expert] . . . . I am satisfied that the only result, appropriate result in this case, is in the award of damages . . . ." The court also stated it was unpersuaded by REA's argument that damages were inadequate because of the difficulty in proving lost profits, noting that REA made the tactical decision to rely solely on its appraiser's valuation of the property at $9 million to establish the adequacy of the consideration.

## B. *General Legal Principles*

■ To obtain specific performance after a breach of contract, a plaintiff must generally show: "(1) the inadequacy of his legal remedy; (2) an underlying contract that is both reasonable and supported by adequate consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract. [Citations.]" (*Tamarind Lithography Workshop, Inc. v. Sanders* (1983) 143 Cal.App.3d 571, 575 [193 Cal.Rptr. 409]; see *Henderson v. Fisher* (1965) 236 Cal.App.2d 468, 473 [46 Cal.Rptr. 173]; Civ. Code, §§ 3384, 3386, 3390, 3391.) A grant or denial of specific performance is reviewed under an abuse of discretion standard. (*Petersen v. Hartell* (1985) 40 Cal.3d 102, 110 [219 Cal.Rptr. 170, 707 P.2d 232].)

In this case, the court refused to specifically enforce the contract based on its finding that the first element (inadequacy of legal remedy) was not satisfied because REA sought to purchase the property as an investment, and not for some particular use of the land. REA contends this finding was incorrect as a matter of law and, alternatively, unsupported by the evidence.

■ It is a familiar legal principle that a damage award is generally an inadequate remedy for a breach of real estate contract, and therefore courts

routinely grant a plaintiff's request for specific performance. (See Thompson & Sebert, Remedies: Damages, Equity and Restitution (2d ed. 1989) pp. 885–886.) This rule arose in medieval England where land ownership was a primary indicator of the owner's social status and voting rights. (See Kirwan, *Appraising a Presumption: A Modern Look at the Doctrine of Specific Performance in Real Estate Contracts* (2005) 47 Wm. & Mary L.Rev. 697, 703; Spyke, *What's Land Got to Do With It?: Rhetoric and Indeterminacy in Land's Favored Legal Status* (2004) 52 Buff. L.Rev. 387, 394, 420–421.) Specific performance was necessary because "[c]ourts of law simply could not value expectations" such as " 'social status' or the right to vote for a representative in Parliament," and substitute performance was virtually impossible because of the unavailability of land for sale. (Kirwan, *supra*, 47 Wm. & Mary L.Rev. at p. 704.)

Although these historical reasons no longer apply, most jurisdictions have continued the rules requiring special treatment of land sale contracts, reflecting the enduring view that: (1) each parcel of land is unique and therefore there can be no adequate replacement after a breach; and (2) monetary damages are difficult to calculate after a party refuses to complete a land sales contract, particularly expectation damages. (See Rest.2d Contracts, § 360.) Some legal commentators have questioned the continued validity of these grounds for specific performance in every case (see Kirwan, *supra*, 47 Wm. & Mary L.Rev. 697; Berkovich, *To Pay or to Convey?: A Theory of Remedies for Breach of Real Estate Contracts* (1995) Ann. Surv. Am. L. 319, 347; 12 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 34.18, p. 72), but the concept has become "well ingrained" (12 Miller & Starr, Cal. Real Estate, *supra*, § 34.18, p. 72), and legislatures and the courts have largely adhered to the rule that specific performance is the appropriate remedy upon a breach of a real estate contract.

### C. *Civil Code Section 3387*

In California, these principles are embodied in Civil Code section 3387. Section 3387 states: "It is to be presumed that the breach of an agreement to transfer real property cannot be adequately relieved by pecuniary compensation. In the case of a single-family dwelling which the party seeking performance intends to occupy, this presumption is conclusive. In all other cases, this presumption is a presumption affecting the burden of proof."[2]

---

[2] This statute was enacted in its present form in 1984. (Stats. 1984, ch. 937, § 1, p. 3177.) Before this time, the statute imposed a presumption that damages were inadequate without specifying whether it was conclusive or rebuttable. In enacting the amendment, the Legislature intended to clarify that the presumption was a rebuttable presumption, but to add a conclusive

■ By imposing a conclusive presumption for certain residential transactions, the Legislature decided that monetary damages can never be satisfactory compensation for a buyer who intends to live at a single-family home, regardless of the circumstances. But by establishing a rebuttable presumption with respect to other property, the Legislature left open the possibility that damages can be an adequate remedy for a breach of a real estate contract. The rebuttable presumption shifts the burden of proof to the breaching party to prove the adequacy of the damages. By so doing, the Legislature intended that a damages remedy for a nonbreaching party to a commercial real estate contract is the exception rather than the rule.

As recognized by both parties and the trial court, there is a dearth of appellate court decisions in this state addressing the issue of the scope of the breaching party's burden to rebut the presumption that the damages remedy is inadequate when the buyer sought to purchase the property for a commercial or investment purpose. Courts generally assume the uniqueness of land and grant specific performance after a breach of a land sale contract in both residential and commercial contexts, with little or no discussion of the adequacy of remedy issue.

Despite this lack of authority, we do not agree with REA's argument that the presumption of the *inadequacy of the remedy* for commercial property is essentially conclusive, and can *only* be rebutted by a finding that specific performance is inappropriate for an independent equitable reason separate and apart from the inadequate remedy factor. A rule that the Civil Code section 3387 presumption can be rebutted only by an "independent" equitable reason is inconsistent with the statutory language that pertains to the adequacy of remedy element. By imposing a rebuttable presumption on the inadequacy of remedy element for certain types of purchases, the Legislature necessarily contemplated that there may be circumstances when the presumption that damages are inadequate can be overcome. Otherwise, the statutory distinction between a purchase of a single-family dwelling that the buyer intends to occupy and all other types of real property purchases would have no meaning.

### D. *Vallas Did Not Meet Burden to Rebut Statutory Presumption in This Case*

But the specific issue presented here is not whether a defendant can ever rebut the inadequacy of remedy presumption. The issue is whether Vallas did so in this case. And on this issue, we agree with REA that Vallas did not

presumption for residential property that is to be occupied by the buyer. (See Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2309 (1983–1984 Reg. Sess.) as amended June 29, 1984, p. 1.)

make a sufficient evidentiary showing to establish damages were adequate to compensate REA for the breach. Under Civil Code section 3387, the trial court was required to presume the inadequacy of damages. Although it did not need to do so, REA produced strong evidence to support the presumption. This evidence showed that the Lanikai Lane property is unique in terms of its size, location, and existing use—it consists of 14.13 acres near the Pacific Ocean and contains an established mobilehome community. The property has ocean views and is close to several desirable local beaches, two major vacation resorts, the Del Mar racetrack, expensive neighborhoods, and major transportation routes. REA's evidence also showed that Lanikai Lane is unique in terms of the potential profits resulting from ownership because of its existing use (mobilehome park) on a long-term lease that would terminate in 2013, and the fact that existing residents would like to obtain ownership interests in the property. REA purchased the property for investment purposes, and it intended to obtain the highest return on this investment by subdividing the property and selling it to the existing residents of the park, which could result in substantial profits.

Given the statutory presumption that damages were inadequate and the largely undisputed evidence strongly supporting this presumption, Vallas had a high threshold to satisfy his burden to show damages would be an adequate remedy. In attempting to do so, Vallas relied primarily on the appraisal of the Lanikai Lane property by REA's expert who considered five recent mobilehome park sales. The sales prices for the comparable properties ranged from $5 million to $23 million. The parks were located in Los Angeles County, San Diego County and Ventura County. None of these sales was subject to a ground lease.

■ This evidence was insufficient to satisfy Vallas's burden. The fact that other mobilehome parks had sold within a recent period does not mean that damages would be adequate to compensate REA for the loss of *this* property and accompanying investment opportunity. As one commentator has pointed out, to disprove the presumption, "a seller [must] show not only abstract replaceability but concrete availability of reasonably interchangeable property at terms within the buyer's means." (Bird, *Toward Understanding California's Rebuttable Presumption that Land is Unique*, 1 Cal. Real Property J. No. 3 (Summer 1983).) There was no information in the appraiser's testimony or his report showing that REA could purchase one of these identified mobilehome park properties on similar terms, or whether REA would be in a similarly situated investment position if it did complete a purchase. Because land is unique, different locations are not necessarily interchangeable, without evidence showing this to be the case.

Perhaps recognizing this gap in the evidence, the trial court did not base its conclusion on the appraisal report or the appraiser's testimony, which it found

to be "of marginal use" because the appraiser "ignored some important data in arriving at his conclusions." Instead, the court found Vallas satisfied his burden based on its findings that REA's "sole purpose" and "entire intent" in buying the property was to "earn money for [its] investors" and "turn a profit . . . as quickly as possible" by reselling the property.

 This reasoning was flawed. Standing alone, the fact that REA was motivated solely to make a profit from the purchase of the property does not overcome the strong statutory presumption that all land is unique and therefore damages were inadequate to make REA whole for the breach. The property was unique not merely because of its physical attributes and location, but also because of its investment potential and the reasonableness of the agreed-upon contract price. These factors fully support the uniqueness of the property and the inadequacy of a monetary remedy. Thus, although REA did not necessarily intend to benefit from its personal or commercial *use* of the land, the land did have a particular unique value because of the manner in which it could be used to earn profits upon a resale. In this respect, the court's analogizing Lanikai Lane to a "widget" or a "commodity" was erroneous because it is inconsistent with the Legislature's fundamental view that land is different from personal property when determining the appropriate legal remedy. The court's reasoning essentially reflected its disagreement with the premise underlying Civil Code section 3387's presumption that all land is unique unless proved otherwise. It was not within the court's discretion to do so. Missing from the court's analysis was the recognition that to rebut the presumption that damages are an inadequate remedy, the defendant must come forward with evidence showing that damages will fully compensate the plaintiff for the breach. The record in this case was bereft of any such evidence.

Our conclusion is consistent with numerous decisions that have upheld specific performance to plaintiffs whose real estate contract was breached, even if the property was to be used for commercial or investment purposes.[3] Although in most of these cases, the court granted specific performance

---

[3] (See, e.g., *Wheat v. Thomas* (1930) 209 Cal. 306 [287 P. 102] [investment property]; *Galdjie v. Darwish* (2003) 113 Cal.App.4th 1331 [7 Cal.Rptr.3d 178] [apartment building]; *Housing Authority v. Monterey Senior Citizen Park* (1985) 164 Cal.App.3d 348 [210 Cal.Rptr. 497] [86-unit apartment building]; *Hutton v. Gliksberg* (1982) 128 Cal.App.3d 240, 243 [180 Cal.Rptr. 141] [apartment building]; *Landis v. Blomquist* (1967) 257 Cal.App.2d 533 [64 Cal.Rptr. 865] [50-unit apartment building]; *Ferguson v. Fajardo* (1964) 211 Cal.App.2d 119 [27 Cal.Rptr. 72] [apartment building]; *Greenstone v. Claretian Theo. Seminary* (1959) 173 Cal.App.2d 21 [343 P.2d 161] [30-unit apartment building], disapproved on other grounds in *Ellis v. Mihelis* (1963) 60 Cal.2d 206, 221 [32 Cal.Rptr. 415, 384 P.2d 7]; *Bleecher v. Conte* (1981) 29 Cal.3d 345 [213 Cal.Rptr. 852, 698 P.2d 1154] [condominium development]; *Hennefer v. Butcher* (1986) 182 Cal.App.3d 492 [227 Cal.Rptr. 318] [condominium development]; *Bravo v. Buelow* (1985) 168 Cal.App.3d 208 [214 Cal.Rptr. 65] [residential development]; *D-K Investment Corp. v. Sutter* (1971) 19 Cal.App.3d 537 [96 Cal.Rptr. 830] [shopping

without a discussion of the adequacy of remedy issue, in one case, the California Supreme Court held a trial court properly found the damages remedy was inadequate despite that the buyer's motivation for purchasing the property may have been for oil speculation purposes. (See *Wheat v. Thomas, supra*, 209 Cal. at p. 317.) On the other hand, no reported California decision has affirmed a trial court's refusal to grant specific performance as the remedy for a seller's breach of a land sale contract on the ground that the buyer's damages remedy was adequate.

### E. *Reese v. Wong*

In refusing to order specific performance, the court relied primarily on a footnote in a Court of Appeal decision, *Reese v. Wong, supra*, 93 Cal.App.4th 51 (*Reese*). This reliance was misplaced.

In *Reese*, the buyer sought damages, and not specific performance, after the seller breached an agreement to sell commercial real property. (*Reese, supra*, 93 Cal.App.4th at p. 54.) In determining the proper measure of damages, the reviewing court rejected a rule suggested in *Stewart Development Co. v. Superior Court* (1980) 108 Cal.App.3d 266 [166 Cal.Rptr. 450] that the damages measure should be different if the breaching seller had successfully expunged a lis pendens. (*Reese, supra*, at pp. 56–59.) In a footnote, the *Reese* court noted in dicta that the Legislature had disapproved another "aspect of the *Stewart* court's decision" applicable to the standards for determining the adequacy of a legal remedy in lis pendens expungement proceedings. (*Id.* at p. 59, fn. 5.) The *Reese* court then quoted from the Real Property Law Section of the California State Bar's comment to Code of Civil Procedure section 405.33, which states in part: "With respect to commercial real estate, a presumption of uniqueness is often inappropriate. The essence of commercial activity is the earning of money; loss of a commercial investment opportunity can normally be offset by a pecuniary award." (Real Property Law Section, Cal. State Bar, com. on Assem. Bill No. 3620 (1991–1992 Reg. Sess.) 3 Assem. J. (1993–1994 Reg. Sess.) pp. 4284–4285, reprinted as Code Com., 14A West's Ann. Code Civ. Proc. (2004 ed.) foll. § 405.33, p. 349.)

The trial court relied on this quotation as its sole legal authority to support its denial of specific performance in this case. To understand why this quotation is inapplicable here, we focus first on the code section to which the

---

center development]; *Pease v. Brown* (1960) 186 Cal.App.2d 425, 428–429 [8 Cal.Rptr. 917] [residential development]; *Kelley v. Russell* (1942) 50 Cal.App.2d 520 [123 P.2d 606] [oil and mineral development]; *Citizens Sav. & Loan Assn. v. Khoury* (1978) 84 Cal.App.3d 244 [148 Cal.Rptr. 529] [banking business]; *Riverside Fence Co. v. Novak* (1969) 273 Cal.App.2d 656 [78 Cal.Rptr. 536] [fence company business]; *Cano v. Tyrrell* (1967) 256 Cal.App.2d 824 [64 Cal.Rptr. 522] [rest home business]; *Moreno v. Blinn* (1947) 81 Cal.App.2d 852 [185 P.2d 332] [dairy business]; *Smith v. Schrader* (1926) 80 Cal.App. 478 [251 P. 967] ["motor transportation business"].)

code comment relates, Code of Civil Procedure section 405.33, which governs lis pendens expungement proceedings and was enacted in 1992. (Stats. 1992, ch. 883, § 2, p. 4102.) The first paragraph of Code of Civil Procedure section 405.33 provides that a court may expunge a lis pendens if the moving party shows that "adequate relief" could be secured by a monetary undertaking. The second paragraph states: "For purposes *only* of determining under this section whether the giving of an undertaking will secure adequate relief to the claimant, the presumption of Section 3387 of the Civil Code that real property is unique shall not apply, except in the case of real property improved with a single-family dwelling which the claimant intends to occupy." (Code Civ. Proc., § 405.33, italics added.)

The Real Property Law Section's comment explaining this second paragraph of section 405.33 begins: "Civil Code [section] 3387 is based upon the historic common law proposition that all real property is unique, and creates a presumption that breach of an agreement to convey real property cannot be adequately relieved by pecuniary compensation. With respect to a single family dwelling which the claimant intends to occupy, the presumption is conclusive. . . . [¶] . . . Case law regarding when real property other than a single family dwelling may be considered unique is not completely consistent." (Real Property Law Section, Cal. State Bar, com. on Assem. Bill No. 3620 (1991–1992 Reg. Sess.) 3 Assem. J. (1993–1994 Reg. Sess.) pp. 4284–4285, reprinted as Code Com., 14A West's Ann. Code Civ. Proc., *supra*, foll. § 405.33, pp. 348–349.)

To demonstrate this lack of consistency, the code comment cites to three Court of Appeal decisions: *Sheets v. Superior Court* (1978) 86 Cal.App.3d 68 [149 Cal.Rptr. 912]; *Stewart Development Co. v. Superior Court*, *supra*, 108 Cal.App.3d 266; and *Jessen v. Keystone Savings & Loan Assn.* (1983) 142 Cal.App.3d 454 [191 Cal.Rptr. 104]. (Code Com., 14A West's Ann. Code Civ. Proc., *supra*, foll. § 405.33, p. 349.) None of these decisions directly addressed the availability of the specific performance remedy after a breach of contract. The decisions instead concerned standards applicable to lis pendens expungement proceedings (*Sheets*; *Stewart Development*), and the availability of injunctive relief (*Jessen*). The *Stewart Development* and *Sheets* reviewing courts each found that a monetary undertaking would not provide adequate protection in place of a lis pendens despite that the sale involved commercial property purchased for investment and/or development. (*Stewart Development, supra*, at pp. 272–273; *Sheets, supra*, at pp. 70–71.) *Jessen* held that where investment property is being marketed at an established price, monetary damages could provide an adequate remedy and thus a preliminary injunction was not available. (*Jessen, supra*, at pp. 457–458.)

The comment then continues: "With respect to commercial real estate, a presumption of uniqueness is often inappropriate. The essence of commercial activity is the earning of money; loss of a commercial investment

opportunity can normally be offset by a pecuniary award. [¶] The presumption generally created by Civil Code [section] 3387 with respect to property other than single family dwellings is only a presumption affecting the burden of proof. The effect of this presumption is merely to place the burden of proof upon the moving party. . . . [The lis pendens statutes are] already worded to place the burden on the moving party, since the court must deny expungement on this ground unless the court finds that an undertaking will secure adequate relief. . . . This section nevertheless makes the presumption inapplicable to property other than single family dwellings for the purpose of clarifying that the moving party's burden is not a heavy or extraordinary one, but rather one which can be satisfied by a simple preponderance of the evidence. . . . *Sheets* and *Stewar[t] Development* are disapproved to the extent inconsistent with this purpose." (Real Property Law Section, Cal. State Bar, com. on Assem. Bill No. 3620 (1991–1992 Reg. Sess.) 3 Assem. J. (1993–1994 Reg. Sess.) pp. 4284–4285, reprinted as Code Com., 14A West's Ann. Code Civ. Proc., *supra*, foll. § 405.33, p. 349.)

Code of Civil Procedure section 405.33 and its commentary plainly reflect the Legislature's view that in certain cases a monetary undertaking will provide adequate protection in lieu of a lis pendens to a disappointed buyer of commercial and/or investment property. In disapproving *Sheets* and *Stewart Development*, the Legislature expressed its intent that trial courts have broad discretion to expunge a lis pendens in a case where the plaintiff/buyer was not intending to use the property for its own purposes and instead sought to purchase the property for commercial development and/or sale.

However, we disagree with the trial court that this intent extends to limit the availability of the specific performance remedy after a court has found a seller breached a commercial land sale contract. In the second paragraph of Code of Civil Procedure section 405.33, the Legislature made clear that Civil Code section 3387's presumption shall not apply "[f]or purposes *only* of determining *under this section* whether . . . an undertaking will secure adequate relief . . . ." (Code Civ. Proc., § 405.33, italics added.) In enacting this provision, the Legislature sought to make it easier to remove a lis pendens based on its concerns with the ease with which a lis pendens notice may be recorded and the burden placed on the seller by a lis pendens that can render a property unmarketable and unsuitable for a secured loan before there has been a trial on the merits. (See *Campbell v. Superior Court* (2005) 132 Cal.App.4th 904, 915–916, 918 [34 Cal.Rptr.3d 68]; see also *Kirkeby v. Superior Court* (2004) 33 Cal.4th 642, 651 [15 Cal.Rptr.3d 805, 93 P.3d 395].)

These concerns are not applicable to a damages remedy after a trial on the merits. At that time, a trial court's focus is on making the buyer whole, rather than on protecting the rights of a property owner who is only *alleged*

to have breached a contract. When this second paragraph was included in Code of Civil Procedure section 405.33, courts had long applied Civil Code section 3387's presumption of an inadequate legal remedy after a breach even when the subject of the deal was commercial or investment property. If the Legislature had intended to change this rule, it could have easily amended section 3387 at the same time, particularly because it specifically referred to section 3387 in the newly enacted version of Code of Civil Procedure section 405.33. ■ By not amending section 3387 at the same time it amended Code of Civil Procedure section 405.33, the Legislature presumably intended the existing interpretations applicable to section 3387 to continue. (See *People v. Yartz* (2005) 37 Cal.4th 529, 538 [36 Cal.Rptr.3d 328, 123 P.3d 604] [" 'The Legislature . . . is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof.' "]; *Cole v. Rush* (1955) 45 Cal.2d 345, 355 [289 P.2d 450] ["The failure of the Legislature to change the law in a particular respect when the subject is generally before it and changes in other respects are made is indicative of an intent to leave the law as it stands in the aspects not amended."]; see also *People v. Silva* (2003) 114 Cal.App.4th 122, 129 [7 Cal.Rptr.3d 473].)

■ In reaching this conclusion we recognize that as a practical matter, the removal of a lis pendens may result in a party losing the right to obtain specific performance if he or she prevails at trial. If the defendant no longer has title to the property, a specific performance remedy may not be possible. (See *Crittenden v. Hansen* (1943) 59 Cal.App.2d 56, 58–59 [138 P.2d 37].) However, it is for the Legislature, and not the courts, to change the presumptions and proof burdens with respect to the availability of a specific performance remedy. There is nothing in the lis pendens statutes suggesting the Legislature was intending to change the long held view that a nonbreaching real estate buyer in a commercial or investment context is entitled to specific performance, unless the seller rebuts the presumption with *evidence* showing that monetary damages are adequate to compensate the buyer.

### III. *Attorney Fees**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 463.

## DISPOSITION

Judgment reversed. The court is ordered to enter a new judgment granting specific performance and to strike the alternate damages remedy. In all other respects, the judgment is affirmed. The attorney fees order is affirmed. Vallas to bear REA's costs on appeal.

Benke, Acting P. J., and McDonald, J., concurred.

The petition of appellant Theodore Tee Vallas for review by the Supreme Court was denied May 21, 2008, S162471.